**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOSEPH SCIBETTA and JOSEPH SCIBETTA, a/k/a BANKERS & BROKERS, a sole proprietorship,<br><br>*Plaintiff*,<br><br>v.<br><br>SLINGO, INC. et al.,<br><br>*Defendants*. | Civil Action No. 16-8175 (JMV)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case concerns the alleged unauthorized use, offer, and sale of the "Bankers & Brokers" online game. Plaintiffs Joseph Scibetta ("Scibetta") and Joseph Scibetta a/k/A BANKERS & BROKERS ("Bankers & Brokers") bring causes of action for patent infringement, trademark infringement, misappropriation, and unjust enrichment. Currently pending before the Court is a motion to dismiss (D.E. 9) Plaintiffs' Complaint (D.E. 1) pursuant to Rule 12(b)(6) by Defendant Slingo, Inc. ("Slingo") and Defendant RealNetworks, Inc.'s ("RealNetworks") (collectively, "Defendants"). The Court reviewed the submissions in support and in opposition,[1] and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the

---

[1] Plaintiffs' Complaint will be referred to hereinafter as "Compl." (D.E. 1); Defendants' brief in support of its motion to dismiss the Complaint will be referred to hereinafter as "Defs. Br." (D.E. 9); Plaintiffs' brief in opposition to Defendants' motion to dismiss the Complaint will be referred to hereinafter as "Pls. Opp." (D.E. 15); Defendants' reply brief will be referred to hereinafter as "Defs. Reply." (D.E. 17).

reasons stated below, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Counts One, Two, Three, Four, and Five are dismissed with prejudice. Counts Six, Seven, and Nine are dismissed without prejudice to allow Plaintiffs the opportunity to file an amended complaint. Count Eight remains.

## I.  FACTUAL BACKGROUND[2]

Plaintiff Joseph Scibetta is a resident of Jersey City, New Jersey. Compl. at ¶ 1. Bankers & Brokers is Scibetta's sole proprietorship and has its principal place of business in New Jersey. *Id.* at ¶ 2. Defendant Slingo was a New Jersey corporation with its principal place of business in New Jersey. *Id.* at ¶ 3. Defendant RealNetworks is a Washington corporation, with its principal place of business also in Washington. *Id.* at ¶ 4. RealNetworks acquired the stock of Slingo in July 2013, *id.* at ¶ 31, and accordingly, Slingo is currently a wholly-owned subsidiary of RealNetworks, *id.* at ¶ 6.

### a.  The Patents at Issue

This case centers on patents for a game called BANKERS & BROKERS. *Id.* at ¶ 23. The electronic version of the game ("B&B Game") is directly at issue in this case, but Plaintiffs also sold a board version, a tower version, and a casino version of the game. *Id.* at ¶ 23. Plaintiffs sold the games under the "BANKERS & BROKERS" wordmark and a corresponding logo (collectively, the "B&B Mark"). *Id.* at ¶ 24.

---

[2] The factual background is taken from the Complaint as well as from the attached patents (D.E. 1). When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), and may also consider "exhibits attached to the complaint and matters of public record," *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Both parties rely on the patents in making their arguments.

Plaintiffs are the exclusive owner of all rights and title to six total patents related to the game—five of which are relevant to this case. *Id.* at ¶ 25. Between April 2001 and December 2010, Plaintiffs were issued the five patents at issue here: United States Patent Nos. 6,220,597 ("the '597 patent"), 6,626,433 ("the '433 patent"), 7,331,580 ("the '580 patent"), 7,618,044 ("the '044 patent"), and 7,857,314 ("the '314 patent"). *Id.* at ¶¶ 14, 16-21; *id.* at Ex. A-E. The specific patent claims relevant to the current motion and highlighted by the parties are described below.

### i. The '597 Patent

The '597 patent, issued on April 24, 2001, contains five claims, one of which is independent. Compl. at Ex. E (the "'597 patent"). Claim 1 of the '597 patent claims steps for conducting a game:

> 1. A method for playing a wagering card game comprising the steps of:
> Providing a shuffled stack of playing cards where the cards are touched only by the dealer during the game comprising at least one deck thereof;
> providing a planar game playing surface comprising a plurality of separately delineated areas adapted for the placement of bets;
> establishing odds for payout of winning bets placed in any of the aforesaid plurality of separated and delineated areas;
> establishing an initial order of play where players are designated as first player, and so on to a last player;
> initiating a round of play by a first player establishing a bet by placing a wager in a designated space on the table near a pot designated and marked onto a surface for displaying a face-up side of a card dealt to each said player;
> dealing a stack of six face-down cards as a player's pot concealing the faces of each dealt card from each player and a dealer, to the first player and any other player in the game;
> dealing a stack of six face-down cards, concealing the faces of each dealt card from each player and the dealer, to the dealer as a dealer's pot;
> then, only the dealer turning the dealer's pot over an turning over the pots over for each player one at a time;

then the dealer immediately determining a player's winning status or loss status by comparing a face-up card dealt to each player and a now face-up card dealt to the dealer in the dealer's pot;

after comparing a dealer's face-up card to a player's face-up card, paying any winning bets placed by each player in the game;

collecting the played or turned up cards from each pot after bets are paid and placing these cards in a discarded cards designated area on the table;

determining whether the turned-up dealer's card matches the corresponding turned-up player's card, whereby at any time during the game or before the dealer may imposed step of disqualifying and discarding any got touched by a player.

'597 Patent, 7:8-44. The dependent claims, Claims 2-5, provide additional steps for the game.

For example, claim 2 claims:

2. The method for playing a wagering card game of chance according to claim 1 further comprising using at least one deck of shuffled, unviewed, face-down cards and also using a substantially flat playing surface having a forward edge and a rearward edge and adapted for playing a game of cards using a deck of cards, the surface further comprising: (a) a primary array of betting spots arranged near the forward edge of the playing surface; (b) a secondary array of spaced apart spaces for placing stacks of dealt cards located on said playing surface between the primary array and the rearward edge, the secondary arraying comprising at least two polygonal areas, one for a player's card pot and another for a dealer's card pot, each area having nearby a different identify symbol displayed nearby and on the playing surface; (c) a machine for shuffling and dealing a deck of cards located on the playing surface; and, (d) a receptacle for discarded cards located on the playing surface.

'597 Patent, 7:45-8:10. Claim 5 claims:

5. The method for playing a wagering card game of chance according to claim 1 further comprising using game apparatus in combination with a deck of playing cards and the additional step of allowing one or more persons to participate as players wherein one person acts as a dealer, and further comprising the step of using the game apparatus wherein said apparatus further comprises:

a playing surface having a forward periphery and a rear periphery;

a portion of the surface adjacent the forward periphery thereof having thereon a plurality of player betting areas at spaced apart locations where each player is to be stationed during a game;

means associated with the playing surface at each of said plurality of player betting areas for designating a player's stack of dealt cards;

a portion of the surface adjacent the rearward periphery thereof having thereon a single area and means associated with the playing surface located in front of the dealer for designating a dealer's stack of dealt cards;

means for storing cards associated with the playing surface for identifying a specific location for discarded or played cards; and a machine means for shuffling and dealing cards associated with the playing surface for identifying a specific location for said machine means.

'597 Patent, 8:23-49.

### ii.  The '433 Patent

The '433 patent, issued on September 30, 2003, is a continuation in part of the '597 patent.

It contains twenty-two claims, five of which are independent.  Compl. at Ex. D (the "'433 Patent").

Claim 1 of the '433 patent claims steps for conducting a game:

1. A method for playing a game wherein said game includes a plurality of game positions having a plurality of player positions and a dealer position, the method comprising of steps of:

b) accepting a wager on at least one of said plurality of player positions made by at least one player;

c) dealing at least one card to each of said wagered positions and said dealer position from at least one deck of cards;

d) initiating at least one round of play where in each round of play a single outcome for each of said wagered positions is available, said single outcome being whether at least one upturned card at a wagered position has a higher ranking than at least one upturned card at said dealer position, said at least one round of play comprising the step of comparing the at least one upturned card at said dealer position from among said at least one card dealt to said dealer position with the at least one upturned card from among said at least one card dealt to each of said wagered positions, wherein the number of said at least one upturned card from among said at least one card dealt to each of said wagered positions is less than or equal to the number of cards dealt to each of said wagered positions; and

5

e) determining a winning or loss status for each of said wagered positions, wherein a winning status is determined for a wagered position when said at least one upturned card dealt to said wagered position has a higher ranking than said at least one upturned card dealt to said dealer position.

'433 Patent, 15:58-16:21. Independent claim 14 of the '433 patent claims:

14. A card game wherein a game participant selects one or more player positions from plurality of displayed player positions to compare a card dealt to each of said selected player positions with a card dealt to a dealer position, said card game comprising:

means for identifying each of said plurality of player positions and said dealer position to the game participant;

means for accepting a wager made by the game participant on at least one of said identified plurality of player positions;

means for dealing at least one card to each of said wagered positions and said dealer position;

means for displaying at least one upturned card from said at least one card dealt to each of said wagered positions;

means for initiating at least one round of play where in each round of play a single outcome for each of said wagered positions is available, said single outcome being whether at least one upturned card at a wagered position has a higher ranking than at least one upturned card at said dealer position;

and means for playing the at least one round of play by comparing the at least one upturned card from said at least one card dealt to each of said wagered positions with the at least one upturned card of said dealer position, wherein the number of said at least one upturned card from said at least one card dealt to each of said wagered positions is less than or equal to the number of cards dealt to each of said wagered positions, and determining a winning or loss status of said game participant.

'433 Patent, 17:31-62. Claim 15 of the '433 patent depends from claim 14 and claims:

15. The card game of claim 14 further comprising: means for awarding a game participant a predetermined amount of credit based on said wager when the means for comparison determines a winning status for said game participant.

'433 Patent, 17:63-67.

6

### iii.  The '580 Patent

The '580 patent, issued on February 19, 2008, is a continuation in part of the '705 patent

(not at issue here), which was a continuation in part of the '433 patent.  Compl. at Ex. A (the "'580

Patent").  It has twenty-one claims, two of which are independent.  Claim 1 of the '580 patent

claims:

> 1. A method for playing a game wherein said game includes a plurality of game positions having at least one player position and at least one dealer position, the method comprising the steps of:
>
> identifying each of said at least one player position and said at least one dealer position to a player; accepting a wager corresponding to at least one of said at least one player position from the player;
>
> providing the player an option to place an additional wager on whether at least one of a plurality of predetermined combinations will be formed by the cards dealt to said wagered and non-wagered player positions;
>
> dealing at least one card to each of said wagered and non-wagered player positions and said at least one dealer position from at least one deck of cards;
>
> comparing an upturned card at said dealer position from among said at least one card dealt to said at least one dealer position with an upturned card from among said at least one card dealt to at least one wagered position;
>
> determining a winning or loss status for the at least one wagered position, wherein a winning status is determined for the at least one wagered position when said upturned card dealt to said at least one wagered position has a higher ranking than said upturned card at said at least one dealer position; and
>
> resolving whether at least one of the plurality of predetermined combinations were formed by said cards dealt to said wagered and non-wagered player positions if the player placed the additional wager.

'580 Patent, 18:60-19:22.  Claim 17 is independent and provides additional rules for the game.

Claims 2-6, 10-17, and 19-21 are dependent and also provide additional rules for the game.

### iv.  The '044 Patent

The '044 patent, issued on November 17, 2009, is a continuation of the '580 patent. Compl. at Ex. B (the "'044 Patent"). It has twenty-four claims, three of which are independent. Claim 1 is similar to the '580 patent's Claim 1 in that it is a "method for playing a game," however it adds a "physical deck of cards" and "determining whether at least one of the plurality of predetermined combinations were formed by said cards dealt to said wagered and non-wagered player positions if the player placed the additional wager." '044 Patent, 18:13-47. Independent Claim 15 of the '044 patent is also similar to the '580 patent's Claim 1, however Claim 15 is directed to a "computer device comprising a processor for executing a set of programmable instructions for playing a card game," '044 Patent, 19:35-20:4, and Claim 22 is directed to a "computer readable medium storing a set of programmable instructions capable of being executed by a processor for playing a card game," '044 Patent, 20:34-21:3. Claims 2-14, 16-21, and 23-24 are dependent and provide additional rules for the game.

### v.  The '314 Patent

The '314 patent, issued on December 28, 2010, is a continuation in part of the '044 patent. Compl at Ex. C (the "'314 Patent"). It has twenty-two claims, four of which are independent. The independent claims in the '314 patent recite rules for playing a wagering card game. However, both claims 1 and 8 of the '314 patent refer to "a processor for executing a set of programmable instructions for playing a card game." '314 Patent, 18:19-49, 19:19-50. Claims 12 and 19 refer to "a display in operative communication with said processor" and "input means in operative communication with said processor for receiving at least one input from a player during play of the card game." '314 Patent, 19:65-20:35, 21:5-22:14.

### b. All Patents – Background of the Invention

All patents contain a section entitled either "Background" or "Background of the Invention." The patents state that they are directed to, respectively, "casino games, and more particularly . . . to a wagering game employing a standard deck of 52 cards, shuffled and then played and dealt in a specific sequence in combination with participating players betting against a dealer or the house that the participating player has a higher card winning hand," '597 Patent, 1:6-13, "table and electronic wagering games, and more particularly . . . to a table and electronic card game," '433 Patent, 1:11-13, and "wagering games, and more particularly . . . to a card game," '580 Patent, 1:20-22; '044 Patent 1:23-24; '314 Patent, 1:26-27.

All patents acknowledge that "[g]ames of chance employing a deck of 52 cards are as old as the invention of cards themselves," '597 Patent, 1:15-16; '433 Patent, 1:15-16; '580 Patent, 1:24-25; '044 Patent 1:26-27; '314 Patent, 1:29-30. The patents further assert that "[t]he concept of using high cards in which to play and wager in card games is also old." '597 Patent, 1:16-18;. '433 Patent, 1:16-18; '580 Patent, 1:25-27; '044 Patent 1:27-29; '314 Patent, 1:30-32.

The patents indicate that the game is intended to simplify and speed-up play when compared to existing card games. For example, the '580 patent references "relatively complex card game[s], such as blackjack, baccarat or stud poker[.]" '580 Patent, 1:40-41. The '044 patent describes existing card games as having "complexity disadvantages[.]" '044 Patent 2:67. In other words, the game described in the patents is intended to be a "card game that is simple to learn and play and that results in simpler, more expedient wagering decisions per hour." '433 Patent, 2:52-58; '580 Patent, 2:61-67; '044 Patent 2:65-3:3; '314 Patent, 2:61-67. The '597 patent further states that the game is "intended to give a novel and new look and feel to the currently popular card games, yet have simplified rules and procedures designed both to encourage use by novice

gamblers and to increase the betting decisions per hour to maximize casino profit." '597 Patent, 4:5-10.

### c. The Alleged Infringement

Plaintiffs claim that "as early as November 2010 through at least February 2015, Defendant Slingo was offering for use and sale, and selling on its website, www.slingo.com, the electronic version of Plaintiffs' BANKERS & BROKERS game – and doing so blatantly using Plaintiffs' B&B Mark – without the consent, authorization or license from Plaintiffs, while possessing actual knowledge of Plaintiff's patents. Compl. at ¶¶ 28, 30. In July 2013, Defendant RealNetworks acquired Defendant Slingo's stock, at which time Slingo had multiple electronic games on its website. *Id.* at ¶ 31. Plaintiffs further claim that as "part of the acquisition, Defendant Slingo purported to 'sell' to Defendant RealNetworks ownership of or other rights in BANKERS & BROKERS and the B&B Mark which . . . Defendant Slingo had no right to sell." *Id.* at ¶ 32. On February 11, 2015, Plaintiffs sent Defendants a letter requesting Defendants cease and desist the use, sale or offer for sale of the B&B Game and/or the B&B Mark. *Id.* at ¶ 37. After receiving the letter, Defendants removed all electronic versions of the B&B Game and B&B Mark. *Id.* at ¶ 38.

Plaintiffs bring nine separate causes of action in this suit. *Id.* at ¶¶ 42-94. Counts One through Five allege infringement Plaintiffs' following patents: the '580 Patent (Count One), the '044 Patent (Count Two), the '314 Patent (Count Three), the '433 Patent (Count Four), and the '597 Patent (Count Five). Count Six claims a violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a). Count Seven alleges trademark infringement of the B&B Mark. Count Eight alleges misappropriation of the B&B Game and the B&B Mark. Lastly, Count Nine claims unjust enrichment.

## II. PROCEDURAL HISTORY

On November 11, 2016, Plaintiffs filed a Complaint against Defendants. D.E. 1. On December 12, 2016, Defendants filed this motion to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6). D.E. 9. Plaintiffs filed a brief in opposition on February 6, 2017, D.E. 15, to which Defendants filed a brief in reply on February 27, 2017, D.E. 17.

## III. LEGAL STANDARD

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under the rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, not entitled to a presumption of truth. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210. In deciding a motion to dismiss the Court may also consider any "document integral to or explicitly

relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation & emphasis omitted)). Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

## IV. ANALYSIS

Defendants first argue that Plaintiffs' patent infringement claims (Counts One, Two, Three, Four, and Five) are directed at a patent-ineligible subject matter. Second, Defendants contend that Plaintiffs' trademark claims (Counts Six and Seven) fail to state a claim for relief pursuant to *Twombly*'s pleading standards. Lastly, Defendants argue that Plaintiffs' state law claims (Counts Eight and Nine) are frivolous. The Court examines each argument in turn.

### a. Plaintiffs' Patent Infringement Claims (Count One, Count Two, Count Three, Count Four, and Count Five)

Counts One through Five allege infringement of Plaintiff's following patents: the '580 Patent (Count One), the '044 Patent (Count Two), the '314 Patent (Count Three), the '433 Patent (Count Four), and the '597 Patent (Count Five). Compl. at ¶¶ 42-71. Defendants argue that these counts should be dismissed because Plaintiffs' patents are directed at a patent-ineligible idea under 35 U.S.C. § 101: a card wagering game played with a standard deck of cards.

Section 101 of the United States Patent Act, 35 U.S.C. § 101, defines the subject matter eligible for patent protection. Section 101 states that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." "[A]ll issued patent claims receive a statutory presumption of validity." *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1284 (Fed. Cir. 2013), *aff'd*, 134 S.Ct. 2347 (2014).

However, the Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014) ("*Alice*") (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). At the same time, the Supreme Court has recognized "that too broad an interpretation of this exclusionary principle could eviscerate patent law. . . . [because] all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012). The final category is often referred to as an unpatentable abstract idea. "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S.Ct. at 2354. "Applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Id.* (internal quotation marks and brackets omitted).

To determine whether a patent claims eligible subject matter, courts employ a two-step analysis. The two steps are often called the *Alice* steps, or the *Alice/Mayo* steps, based on the Supreme Court decisions that announced the process. *See Alice Corp. Pty. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012). First a court should "determine whether the claims at issue are directed to one of those patent-ineligible concept[.] *Alice*, 134 S.Ct. at 2355 (internal citations and quotations omitted). If the claims do concern such a concept, then the second step requires to determine whether patent contains an "inventive concept." In determining whether there is an inventive concept, a court must ask "what else is there in the claims before us? To answer that question, [a court shall] consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal

citations and quotations omitted); *see Eagle View Techs., Inc. v. Xactware Sols., Inc.*, 2016 WL 4154136, at *2 (D.N.J. Aug. 2, 2016) ("In evaluating whether a patent claims patent eligible subject matter under § 101, the Court undertakes a two-step inquiry to determine: (1) whether the patent claims the aforementioned laws of nature, natural phenomena, or abstract ideas; and (2) if so, whether the 'elements of each claim both individually and 'as an ordered combination' . . . 'transform the nature of the claim' into a patent-eligible application.'" (quoting *Alice*, 134 S.Ct. at 2355)). As noted, step two has been described "as a search of an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S.Ct. at 2355. (internal quotations and citations omitted).

Before conducting the two-step analysis set forth in *Alice*, the Court will address Plaintiffs' contentions that reviewing patent eligibility is inappropriate at the motion to dismiss stage. First, Plaintiffs argue that discovery and claims construction should take place before any determination of patent eligibility. Plfs. Opp. at 13-14. However, Plaintiffs' contention is not tenable in light of the controlling law. Courts have repeatedly held that the determination of whether a concept is patent-eligible under Section 101 is a matter of law and may be resolved at the motion to dismiss stage. *See FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." (internal quotation omitted)); *see also Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 242 (2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *In re BRCA1– and BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 759 (Fed. Cir. 2014); *cf. Eagle View*, 2016 WL 4154136, at *2 ("Although

the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable perquisite to a validity determination under § 101. . . . But, it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis." (internal quotations and citations omitted)). As described below, the Court has undertaken a comprehensive and diligent analysis of all of Plaintiffs' claims and finds that it possesses a "full understanding of the basic character of the claimed subject matter" and, therefore, claim construction is unnecessary.

Plaintiffs next argue that Defendants did not address each and every claim and that the large number of claims at issue preclude dismissal at this stage. Plfs. Opp. at 12-14. However, the controlling case law provides that if "claims of the asserted patents are substantially similar in that they recite little more than the same abstract idea," a court may treat those patent claims as representative. *See, e.g., Content Extraction*, 776 F.3d at 1348[3]; *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1268 n.2 (Fed. Cir. 2016) (treating one claim as representative of 20 claims), *cert. denied*, 137 S.Ct. 1596 (2017). A large number of patent claims also does not preclude a court from ruling on a motion to dismiss. *See, e.g., Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 2013 WL 3964909, at *5 (D.N.J. July 31, 2013), *aff'd*, 776 F.3d 1343 (Fed. Cir. 2014) (finding that 242 claims in four patents were directed at ineligible subject matter after examining representative claims).

Plaintiffs also contend that the statutory presumption of a patent's validity militates against dismissing Plaintiffs' claims. Plfs. Opp. at 12-13. Under Section 101, "all issued patent claims

---

[3] In *Content Extraction*, the parties stipulated to representative claims. Here, Plaintiffs have not stipulated that any claims are representative and argue that this is not possible given the facts of this case. As a result, the Court will address the claims cited by Plaintiffs as preventing a motion to dismiss and will construe those patent claims in "the manner most favorable" to Plaintiffs. *Id.* at 1348.

receive a statutory presumption of validity" and that this "presumption applies when [Section] 101 is raised as a basis for invalidity in district court proceedings." *Alice*, 717 F.3d at 1284. However, the *Alice* court, in its next sentence, confirmed that district courts may determine patent invalidity before claim construction, finding "that the district court correctly held that the asserted claims . . . are not patent eligible and are hence invalid under [Section] 101." *Id.*

Plaintiffs also point to *Data Distribution Techs., LLC v. BRER Affiliates, Inc.*, 2014 WL 4162765 (D.N.J. Aug. 19, 2014), in which the court cautioned that if a court "is going to invalidate [a patent] on subject matter eligibility grounds before claim construction, then Defendants must 'establish that the only plausible construction [i]s one that, by clear and convincing evidence render[s] the subject matter ineligible (with no factual inquiries).'" *Id.* at *6 (alterations in original) (citing *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, 2014 WL 923280, *3 (E.D.Tex. Jan. 21, 2014)). Yet, the court also recognized that "[a]lternatively, the Court may adopt[ ] a construction most favorable to the patentee." *Id.* (quotation omitted) (some alterations in original); *see Content Extraction*, 776 F.3d at 1349 (finding a district court's examination of patent claims "in the manner most favorable" to the patentee at the pleading stage was proper). Here, the Court follows this standard and examines these patents while adopting a construction most favorable to Plaintiffs. Therefore, the Court moves to considering whether Plaintiffs' patents claim patent eligible subject matter under Section 101.

### i. *Alice* Step One

*Alice* step one requires a court to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S.Ct. at 2355 (internal citations and quotations omitted). In *In re Smith*, the Federal Circuit considered similar patent claims directed at a game of chance based on a standard card deck and determined that the claims related to the game were

unpatentable abstract ideas under the first step.[4] *In re Smith*, 815 F.3d 816 (Fed. Cir. 2016), *cert.*

*denied sub nom.*, *Trading Techs. Int'l, Inc. v. Lee*, 137 S.Ct. 453 (2016). Following the Supreme

---

[4] In *In re Smith*, the first claim of the patent provided as follows:

> 1. A method of conducting a wagering game comprising:
>
> [a] ) a dealer providing at least one deck of ... physical playing cards and shuffling the physical playing cards to form a random set of physical playing cards;
>
> [b] ) the dealer accepting at least one first wager from each participating player on a player game hand against a banker's/dealer's hand;
>
> [c] ) the dealer dealing only two cards from the random set of physical playing cards to each designated player and two cards to the banker/dealer such that the designated player and the banker/dealer receive the same number of exactly two random physical playing cards;
>
> [d] ) the dealer examining respective hands to determine in any hand has a Natural 0 count from totaling count from cards, defined as the first two random physical playing cards in a hand being a pair of 5's, 10's, jacks, queens or kings;
>
> [e] ) the dealer resolving any player versus dealer wagers between each individual player hand that has a Natural 0 count and between the dealer hand and all player hands where a Natural 0 is present in the dealer hand, while the dealer exposes only a single card to the players;
>
> [f] ) as between each player and the dealer where neither hand has a Natural 0, the dealer allowing each player to elect to take a maximum of one additional card or standing pat on the initial two card player hand, while still having seen only one dealer card;
>
> [g] ) the dealer/banker remaining pat within a first certain predetermined total counts and being required to take a single hit within a second predetermined total counts, where the first total counts range does not overlap the second total counts range;
>
> [h] ) after all possible additional random physical playing cards have been dealt, the dealer comparing a value of each designated player's hand to a final value of the banker's/dealer's hand wherein said value of the designated player's hand and the banker's/dealer's hand is in a range of zero to nine points based on a pre-established scoring system wherein aces count as one point, tens and face cards count as zero points and all other cards count as their face value and wherein a two-digit hand total is deemed to have a value corresponding to the one's digit of the two-digit total;

Court's reasoning in *Alice* and *Bilski*, the Circuit found that the applicants' claims regarding "rules for conducting a wagering game [] compare to other 'fundamental economic practice[s]' found abstract by the Supreme Court." *In re Smith*, 815 F.3d at 818 (Fed. Cir. 2016). The Federal Circuit determined that the "applicants' claimed 'method of conducting a wagering game' is drawn to an abstract idea much like" the claims found to be patent ineligible in *Alice* and *Bilski*.[5] *Id.* at 819.

In light of the Federal Circuit's holding in *In re Smith*, this Court concludes that Plaintiffs' patent claims are directed towards an unpatentable abstract idea under step one of the *Alice* analysis. *See Planet Bingo, LLC v. VKGS, LLC*, 961 F. Supp. 2d 840, 857, 854 (W.D. Mich. 2013) (holding that patent claims for managing a bingo game were drawn to patent-ineligible subject matter under *Alice* step one), *aff'd*, 576 F. App'x 1005 (Fed. Cir. 2014). The Court finds that there is no meaningful distinction between, on the one hand, the unpatentable abstract idea found in *In re Smith* and, on the other hand, the method and system claims or between the independent and dependent claims of Plaintiffs' patents. In short, the Court does not see any material difference in any of the patents to preclude the application of the *In re Smith* court's ruling.[6] *In re Smith* and

---

[i] ) the dealer resolving the wagers based on whether the designated player's hand or the banker's/dealer's hand is nearest to a value of 0.

*In re Smith*, 815 F.3d at 817–18.

[5] In *Alice*, the Supreme Court held that "a method of exchanging financial obligations was drawn to an abstract idea." *In re Smith*, 815 F.3d at 819 (citing *Alice*, 134 S.Ct. at 2356–57). In *Bilski*, the Supreme Court "determined that a claim to a method of hedging risk was directed to an abstract idea." *In re Smith*, 815 F.3d at 819 (citing *Bilski v. Kappos*, 561 U.S. 593, 612 (2010)). The *In re Smith* Court found that the applicants' method of conducting a wagering game was analogous to the abstract ideas in *Alice* and *Bilski*.

[6] Plaintiffs argue that *In re Smith* does not suggest that all card games are patent ineligible. Plfs. Opp. at 15. This is accurate. The *In re Smith* court observed that its holding

is not [meant] to say that all inventions in the gaming arts would be foreclosed from patent protection under § 101. We could envisage,

the current case both concern patents directed towards a wagering game using at least one standard deck of cards.

Plaintiffs argue that Defendants oversimplify the focus of Plaintiffs' claims.[7] However, these arguments are unconvincing. For example, Plaintiffs rely on independent claim 14 of the '433 patent and compare it with claim 1 of the '433 patent, arguing that "[t]he form and scope of claim 14 . . . is quite distinct from the form and scope of claim 1." Plfs. Opp. at 17. Plaintiffs point to the fact that the '433 patent describes "means" for identifying player/dealer positions, accepting a wager, dealing, displaying cards, initiating at least one round of play, and playing one round while determining the winning or loss status of a participant. Plfs. Opp. at 18. However, these aspects do not change the fact that the game itself stems from a patent ineligible abstract idea. The same is true of Plaintiffs' contention that dependent claim 15 of the '433 patent shows

--------

for example, claims directed to conducting a game using a new or original deck of cards potentially surviving step two of *Alice*. The Government acknowledged as much during oral argument [citing section of oral argument.]

815 F.3d. at 819. Turning to the recording of the oral argument, the government, in fact, posits that "any set of rules for game" are an abstract idea under step one, but suggests that a game like Skip-Bo® could pass muster under step two. *See In re Smith* Oral Argument at 14:59-15:31, *available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2016-2303.mp3.*

However, Plaintiffs also argue that "the USPTO continues to issue patents directed to conventional card games in the wake of *Smith*," thereby showing *In re Smith*'s limited holding. Plfs. Opp. at 15. The *In re Smith* court itself explains that it is possible for a card game to survive step two of *Alice* if a claim has an "'inventive concept' sufficient to 'transform' the claimed subject matter into a patent-eligible application of the abstract idea." *In re Smith*, 815 F.3d at 819. The Court cannot delegate its duty to conduct an appropriate review of the patents to the USPTO.

[7] Plaintiffs make these arguments in reference to *Alice* step one, however they are better suited for step two analysis. Even considering Plaintiffs' arguments under step two, the Court finds them unpersuasive because the claims do not include inventive concepts that transform the abstract concept into patent eligible claims.

that it is a patent eligible concept. Plfs. Opp. at 19-20. Therefore, the Court considers all of the claims within the five relevant patents together for the purposes of this analysis, and finds that the patents are directed at a patent ineligible abstract idea under *Alice* step one.

    ii.   **Alice Step Two**

Because the claims at issue are directed at a patent ineligible abstract idea, the Court turns to the second *Alice* step. Step two requires a court to "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 134 S.Ct. at 2355 (internal citations and quotations omitted). Plaintiffs claim that even if its patent claims are directed to an unpatentable abstract idea under step one, the claims nevertheless satisfy *Alice* step two because certain claims "provide meaningful structural limits on the scope of the claims to claim substantially less than the abstract idea itself," Plfs. Opp. at 21-22 (referring to the '597 patent), and because other claims add "limiting, inventive concepts," Plfs. Opp. at 22-26 (referring to the '580, '044, and '314 patents). Plaintiffs point to claim 1 of the '580 patent by way of example. Plfs. Opp. at 24. Plaintiffs argue that claim 1 of the '580 patent "provides a player with the opportunity to make multiple wagers: at least one wager corresponding to a comparison of the values of cards dealt to the at least one player position and at least one dealer position . . . and an additional wager corresponding to a combination of card values dealt to both the wagered and to non-wagered player positions." Plfs. Opp. at 24. Relying on *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), Plaintiffs argue that claim 1 provides a "specific, discrete, and technical implementation that improves the speed of play while maintaining player interests." Plfs. Opp. at 25.

Plaintiffs further indicate that the remaining claims in the '580 patent, '044 patent, and '314 patent each "claims a method, computer device or associated computer readable medium that enable a player to engage in multiple wagers." Plfs. Opp. at 25. Plaintiffs continue that the wagers consist of at least one wager based on the player and dealer's cards as well as at least one wager concerning the player's cards vis-à-vis "one or more of a payout table of cards and/or cards dealt to the dealer positions." Plfs. Opp. at 25. The Court finds that Plaintiffs' patent claims do not transform the nature of the claims into a patent-eligible application.

### a. *Alice* Step Two - Generally

Under *Alice* step two, a court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (internal citation omitted). The Supreme Court has described this step "as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotation marks and citations omitted). "A claim that recites an abstract idea must include 'additional features' to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea. . . . [T]ransformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* at 2357 (internal quotations and citations omitted). "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an 'inventive concept.'" *Id.* (internal citations and quotations omitted); *see In re Smith*, 815 F.3d at 819 (finding that "appending purely conventional steps to an abstract idea does not supply a sufficiently inventive concept"). In other words, pursuant to the *Alice* framework, "a claim directed to a newly discovered law of nature (or natural phenomenon or abstract idea) cannot

rely on the novelty of that discovery for the inventive concept necessary for patent eligibility; instead, the application must provide something inventive, beyond mere 'well-understood, routine, conventional activity.'" *Genetic Techs.*, 818 F.3d at 1376 (quoting *Mayo*, 132 S.Ct. at 1294).

Plaintiffs' game here is one of wagering, using at least one standard deck of cards, with a dealer and one or more players (in certain "positions"), in which players can make one or more wagers. Such a game reflects well-understood, routine, and conventional wagering activity. Plaintiffs made no technical improvement on the original abstract idea of a card wagering game using a standard deck of cards. In fact, Plaintiffs repeatedly emphasize the simplistic nature of the game, stating that it "provides the advantage of simple, easy-to-learn rules enabling rapid play and higher volumes of wagering[.]" Plfs. Opp. at 24 (citing the '580 Patent, 2:64-67). The Court finds that the ability to place multiple wagers is the exact type "well-understood, routine, conventional activit[ies] previously known to the industry" that fails to transform Plaintiffs' patent ineligible concept into a patent eligible concepts. *See, e.g., Alice*, 134 S.Ct. at 2359 (internal quotation and citation omitted). In fact, Plaintiff cites a number of games that already allow placing multiple wagers. *See* '314 Patent, 1:41-42, 1:62-64, 2:3-5 (describing prior art). In short, the ability to place multiple wagers is not the type of "additional elements" sufficient to "transform the nature of the claim into a patent-eligible application." *Alice*, 134 S.Ct. at 2355 (internal citations and quotations omitted). Taking the patent claims in the light most favorable to Plaintiffs, there is simply no way to read the claims as adding any technical improvement to the patent-ineligible abstract concept.

### b. Use of Computer and Related Devices

As described above, Plaintiffs next argue that claims in the '580 patent, '044 patent, and '314 patent each "claim a method, computer device or associated computer readable medium that

enable a player to engage in multiple wagers" and that "fact issues remain as to whether these discrete limitations transform what Defendants characterize as an abstract idea into patentable subject matter under *Alice* step 2." Plfs. Opp. at 25. However, Supreme Court precedent is clear that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

In *Alice*, the Supreme Court examined patent claims directed at "a computer-implemented scheme for mitigating 'settlement risk' (i.e., the risk that only one party to a financial transaction will pay what it owes) by using a third-party intermediary." *Id*. at 2351–52. After finding that the patent claims were "directed to the abstract idea of intermediated settlement," *id*. at 2357, the Court moved to step two and found that the "method claims simply recite the concept of intermediated settlement as performed by a generic computer," *id*. at 2359. The *Alice* Court explained its reasoning by observing that "[g]iven the ubiquity of computers . . . wholly generic computer implementation is not generally the sort of 'additional feature' that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id*. at 2358 (internal citations and quotations omitted). Considering the claims as a whole, the *Alice* Court observed the following as to the method claims before it:

> [The] claims do not, for example, purport to improve the functioning of the computer itself. . . . Nor do they effect an improvement in any other technology or technical field. . . . Instead, the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer. . . . Under our precedents, that is not 'enough' to transform an abstract idea into a patent-eligible invention.

*Id*. at 2359–60 (internal quotations and citations omitted). The Supreme Court similarly found the media and system claims at issue in the case failed for similar reasons—namely, because they

simply "recite a handful of generic computer components configured to implement the same idea." *Id*. at 2360.

A number of other courts have similarly found that a patent's claim for implementation via a computer (or related elements and devices) does not transform unpatentable abstract ideas into patent eligible material under *Alice* step two. In *Content Extraction*, the Federal Circuit reviewed patent claims directed at "extracting data from hard copy documents using an automated digitizing unit such as a scanner, . . . recognizing specific information from the extracted data, and . . . storing that information in a memory. . . . using software on an automated teller machine (ATM)." 776 F.3d at 1345. The *Content Extraction* court, after finding that the asserted patent claims were directed at patent ineligible abstract ideas under *Alice* step one, found that under *Alice* step two, the claims "contain no limitations—either individually or as an ordered combination—that transform the claims into a patent-eligible application." *Id*. at 1348. The *Content Extraction* court continued further observed as follows:

> For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of well-understood, routine, and conventional activities previously known to the industry. . . . Further, the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.

*Id*. at 1347–48 (internal quotations, citations, and brackets omitted).

In *Intellectual Ventures*, the Federal Circuit considered three patents, "the first two of which generally relate to activities on the Internet, and the third of which generally relates to photography organization using a computer." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1365 (Fed. Cir. 2015). Finding that the patents were ineligible under *Alice* step two, the *Intellectual Ventures* court made clear that "merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise

24

abstract idea." *Id.* at 1370.[8] In that case, the patent-holder "argue[d] that [their claimed] 'interactive interface' is a specific application of the abstract idea that provides an inventive concept." *Id.* However, the *Intellectual Ventures* court found that "nowhere does [the patent-holder] assert *that it invented* an interactive interface that manages web site content. Rather, the interactive interface limitation is a generic computer element." *Id.* (emphasis added).

In *FairWarning*, the Federal Circuit reviewed claims related "to a system and method of detecting fraud and/or misuse in a computer environment based on analyzing data such as in log files, or other similar records, including user identifier data." 839 F.3d 1089, 1093. After the *FairWarning* court first found that the claims were directed at patent ineligible abstract ideas under *Alice* step one, *id.* at 1094 ("FairWarning's claims merely implement an old practice in a new environment"), the court moved to *Alice* step two and determined "that there [was] nothing claimed in the patent—either by considering the claim limitations individually or as an ordered combination—that [made] its claims patent eligible." *Id.*, at 1097. The court explained that the claims provided "nothing sufficient to transform the nature of the claim into a patent-eligible application," *id.* at 1095 (internal quotations and citations omitted), because "the *use of generic computer elements like a microprocessor or user interface* do not alone transform an otherwise abstract idea into patent-eligible subject matter," *id.* at 1096 (emphasis added).[9]

---

[8] *See also CLS Bank, Int'l v. Alice Corp.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (*en banc*) *aff'd*, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014) ("[S]imply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility." (citations omitted)); *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter.").

[9] The *FairWarning* court further explained that:

> [w]hile it is not always true that related system claims are patent-ineligible because similar method claims are, when they exist in

Lastly, in *Planet Bingo*, the Federal Circuit examined "two patents for computer-aided management of bingo games." *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1006 (Fed. Cir. 2014). In that case, "[a]part from managing a game of bingo, the claims at issue also require[d] 'a computer with a central processing unit,' 'a memory,' 'an input and output terminal,' 'a printer,' in some cases 'a video screen,' and 'a program ... enabling' the steps of managing a game of bingo.'" *Id.* at 1008 (citing patents at issue). These computer elements, "in turn, select, store, and retrieve two sets of numbers, assign a player identifier and a control number, and then compare a winning set of bingo numbers with a selected set of bingo numbers." *Id.* (citing patents at issue). The *Planet Bingo* court explained that while the patent-holder "argu[ed] that the patents recite significantly more than an abstract idea because the invention includes complex computer code with three distinct subparts," the Federal Circuit disagreed, and found that the "patents do not claim the 'accounting program,' 'ticket program,' and 'verification program' that Planet Bingo identifies in its briefs." *Id.* at 1008-09. Instead, according to the Circuit, "the claims recite a program that is used for the generic functions of storing, retrieving, and verifying a chosen set of bingo numbers against a winning set of bingo numbers. And, as was the case in *Alice*, the function performed by the computer at each step of the process is purely conventional." *Id.* Accordingly, the *Planet*

---

the same patent and are shown to contain insignificant meaningful limitations, the conclusion of ineligibility is inescapable. . . . The claims here are decidedly not the exception to that rule. The limitations added in FairWarning's system claims merely graft generic computer components onto otherwise-ineligible method claims. As such, these claims are patent ineligible along with claim 1 and its dependents.

839 F.3d at 1096 (internal quotations and citations omitted).

*Bingo* court found that at the second step, the claims did not sufficiently transform the ineligible

abstract idea into a patent-eligible application. *Id.*

Here, Plaintiffs' most sophisticated and intricate patent claims related to computer

technology are included in the '314 patent. In claim 1, the patent claims

> A computer device comprising:
> a processor for executing a set of programmable instructions for playing a card game, said card game including the steps of:
> identifying each of said at least one player position and said at least one dealer position to a player;
> accepting a wager corresponding to at least one of said at least one player position from the player;
> providing the player an option to place an additional wager on whether at least one of a plurality of predetermined combinations will be formed with said at least one card dealt to each of said wagered and non-wagered player positions;
> dealing at least one card to each of said wagered and non-wagered player positions and said at least one dealer position from at least one deck of cards;
> comparing an upturned card at said dealer position from among said at least one card dealt to said at least one dealer position with an upturned card from among said at least one card dealt to at least one wagered position;
> determining a winning or loss status for the at least one wagered position, wherein a winning status is determined for the at least one wagered position when said upturned card dealt to said at least one wagered position has a higher ranking than said upturned card at said at least one dealer position; and
> resolving whether at least one of the plurality of predetermined combinations were formed with said at least one card dealt to each of said wagered and non-wagered player positions if the player placed the additional wager.

'314 Patent, 18:19-49. Claim 12 of the '314 patent claims

> A computer device comprising:
> a processor for executing a set of programmable instructions for playing a card game;
> a display in operative communication with said processor; and
> input means in operative communication with said processor for receiving at least one input from a player during play of the card game;

wherein the card game entails the processor performing the steps of:

identifying at least one player position and at least one dealer position to a player;

accepting a wager corresponding to at least one of said at least one player position from the player;

providing the player an option to place an additional wager on whether at least one of a plurality of predetermined combinations will be formed with said at least one card dealt to each of said wagered and non-wagered player positions;

dealing at least one card to each of said wagered and non-wagered player positions and said at least one dealer position from at least one deck of cards;

comparing an upturned card at said dealer position from among said at least one card dealt to said at least one dealt position with an upturned card from among said at least one card dealt to at least one wagered position;

determining a winning or loss status for the at least one wagered position, wherein a winning status is determined for the at least one wagered position when said upturned card dealt to said at least one wagered position has a higher ranking than said upturned card at said at least one dealer position; and

resolving whether at least one of plurality of predetermined combinations were formed with said at least one card dealt to each of said wagered and non-wagered player positions if the player placed the additional wager.

'314 Patent, 19:65-20:35.

The '433 patent also contains a claim for a "computer device comprising a processor for executing a set of instructions for playing a card game[.]" '433 Patent, 18:1-3. The patent further claims a "computer-readable medium storing a set of instructions for playing a card game[.]" *Id.* at 18:48-49. The '580 patent claims playing the game by way of "an electronic gaming device," and "Internet[.]" '580 Patent, 19:46-51. The '044 patent has claims similar to those of the '433 patent. '044 Patent, 19:35-37; 20:34-36.

These claims, representing the most sophisticated and intricate claims related to a computer technology, amount to no more than "the mere recitation of a generic computer" or related elements that has been repeatedly described as inadequate to "transform a patent-ineligible abstract

idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. Just as in *Alice*, the claims do nothing more than simply describe the application of the game-related abstract ideas to a generic computer system. *See id.* at 2359–60 ("The method claims do not, for example, purport to improve the functioning of the computer itself. . . . Nor do they effect an improvement in any other technology or technical field. . . . Instead, the claims at issue amount to nothing significantly more than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer." (internal quotations and citations omitted)). As the *FairWarning* court indicated, "the use of generic computer elements like a microprocessor or user interface do not alone transform an otherwise abstract idea into patent-eligible subject matter. 839 F.3d at 1096. The claims here do not indicate that they are improving the functioning of the computer (or its elements). In sum, the claims concerning computers and related elements are well-known, routine, and conventional.

Plaintiffs argue that at least certain claims survive pursuant to *Bascom*. In *Bascom*, the court found that the relevant claims "recite[d] a specific, discrete implementation of the abstract idea" because the "particular arrangement of elements [was] a *technical improvement* over prior art." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (emphasis added). The *Bascom* court considered patent claims for a method and system for filtering internet content. When examining the claims under *Alice* step two, the court found that "[t]he claims do not merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components." *Bascom*, 827 F.3d at 1350. Instead, the claims "recite a specific, discrete implementation of the abstract idea of filtering content. Filtering content on the Internet was already a known concept, and the patent describes how its particular arrangement of elements is a technical improvement over prior

art ways of filtering such content." *Id*. The claims at issue here offer no such technical improvement. *Bascom* is not applicable.

### c. Considering Patent Claims Individually and in an Ordered Combination

A court must consider the relevant claims both individually and as an ordered combination to determine if the claims add something "that is not already present when the steps are considered separately." *Alice*, 134 S. Ct. at 2359 (internal quotations and citations omitted). For example, as discussed, the *Content Extraction* court found that relevant patent claims considered either individually or as an ordered combination did not transform the claims into a patent eligible concept because the claims merely considered the application of the abstract idea using existing and common technology. 776 F.3d at 1348 ("CET's claims merely recite the use of this existing scanning and processing technology to recognize and store data from specific data fields such as amounts, addresses, and dates. . . . There is no 'inventive concept' in CET's use of a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry. . . . At most, CET's claims attempt to limit the abstract idea of recognizing and storing information from hard copy documents using a scanner and a computer to a particular technological environment. Such a limitation has been held insufficient to save a claim in this context." (internal citations omitted)).[10]

_____

[10] Additionally, as to the effect of any dependent claims, while these claims have by definition a narrower scope than the independent claims, none of the independent or dependent claims contain an "inventive concept" that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea described in Plaintiffs' five relevant patents. *See Content Extraction*, 776 F.3d at 1349 ("CET argues on appeal that certain dependent claims recite additional steps, such as extracting and detecting specific data fields, repeating some steps, and storing data as images or text, rendering those claims patent-eligible. . . . This limitation merely describes generic optical character recognition technology, which CET conceded was a routine function of scanning technology at the time the claims were filed. . . . Indeed, all of the additional limitations in the claims cited in CET's appeal brief recite well-known, routine, and

The Court finds that when considering Plaintiffs' patent claims either individually, or as an ordered combination, there is nothing to transform the claims into patent-eligible material. After an exhaustive examination of Plaintiffs' claims both individually and as an ordered combination, just as in *Alice* and *FairWarning*, the Court sees no meaningful difference between Plaintiffs' method, system, computer, game, and media claims. Plaintiffs have simply not provided any "additional elements [to] transform the nature of the claim[s] into a patent-eligible application of [an] abstract idea." *Content Extraction*, 776 F.3d at 1347 (citing *Alice*, 134 S. Ct. at 2355).

For the foregoing reasons, Counts One, Two, Three, Four, and Five are dismissed with prejudice.

### b. Plaintiffs' Trademark Infringement Claims (Count Six and Count Seven)

Count Six alleges a violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), while Count Seven alleges trademark infringement of the B&B Mark. Compl. at ¶¶ 72-86. Defendants argue that Plaintiffs fail to plead facts that are sufficient to state valid claims for trademark infringement under Section 43 of the Lanham Act or under state common law.

To state a valid claim for trademark infringement, Plaintiffs "must show (1) ownership of a valid and legally protectable mark; (2) that defendant used the mark 'in commerce' (3) in connection with the sale, offering for sale, distribution, or advertising of goods and services (4) in a manner likely to confuse customers." *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 281–82 (D.N.J. 2006) (internal quotations and citations omitted). In this matter, Plaintiffs'

---

conventional functions of scanners and computers. Thus, while these claims may have a narrower scope than the representative claims, no claim contains an "inventive concept" that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." (internal citations omitted)).

mark was not registered. "With respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991). The elements of Plaintiffs' claims in Count Six and Count Seven are identical and are therefore considered together. *See J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002) ("[T]he elements for a claim for trademark infringement under the Lanham Act are the same as the elements for . . . claims of trademark infringement . . . under New Jersey statutory and common law.").

Defendant argues that Plaintiffs "offer no well-pled allegations of fact that they used in commerce an version of the B&B Mark prior to 2003." Defs. Br. at 31. The Court finds that Plaintiffs' allegations about prior use are sufficiently pled. Defendants argue that Plaintiffs "nakedly allege that they 'used the B&B Mark in U.S. interstate commerce prior to Defendants' first use of the mark,'" Defs. Br. at 31 (quoting Compl. at ¶ 76), but Plaintiffs' Complaint is actually more specific. The Complaint provides that "Plaintiffs currently use the B&B Mark in U.S. interstate commerce and have continuously used the B&B Mark nationwide, *since at least the 1990's*," Compl. at ¶ 75 (emphasis added), and that "Plaintiffs used the B&B Mark in U.S. interstate commerce prior to Defendants' first use of the mark," *id.* at ¶ 76. Courts have found that this amount of specificity is sufficient to put Defendants on enough notice to satisfy Rule 8 and *Iqbal/Twombly. Advanced Baseball Acad., LLC v. Google, Inc.*, 2015 WL 1440656, at *5 (D. Kan. Mar. 30, 2015) ("To comply with Rule 8(a)(2), plaintiff is not required to provide the specific date or time that it first used the [mark at issue]." (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007))).[11]

---

[11] Defendants indicate that Slingo used the B&B Mark in 2003, Defs. Br. at 31, a fact that is not mentioned in the Complaint. Of course, this is a motion to dismiss, in which the Court must accept the factual pleadings as accurate with a few exceptions. More importantly, the Complaint

However, Defendants also argue that the Complaint does not show that Plaintiffs made continuous use of a single term. Defendants note that while Plaintiffs' Complaint cites "BANKERS & BROKERS" and its corresponding logo as the relevant word mark, Plaintiffs provide exhibits that show a number of word variations including "Bankers and Brokers," "*Bankers and Brokers*," "Bankers & Brokers," Bankers and Brokers 7 CARD," "Bankers $ Brokers," "Banker Broker," and "Bankers Broker." *See* Compl. at Ex. B, D, F, G. Plaintiffs' Complaint also provides exhibits showing various logos. See Compl. at ¶¶ 24, 28, 75; Compl. at Ex. F. Plaintiffs respond that these differences are immaterial and that the doctrine of tacking applies. Pls. Opp. at 28-30. However, Plaintiffs' tacking argument is in direct contradiction to Plaintiffs' contention in the Complaint that they marketed and sold the game under the work mark "BANKERS & BROKERS." Compl. at ¶ 24. Simply put, Plaintiffs fail to include any information to support their tacking argument in their Complaint. The Court finds that Plaintiffs' pleadings regarding continuous use of the B&B Mark do not provide Defendants with sufficient notice of Plaintiffs' claimed continuous use of the B&B Mark under the requirements of Rule 8 and *Iqbal/Twombly*. Therefore, the Court grants Defendants' motion to dismiss Counts Six and Seven without prejudice.

### c. Plaintiffs' State Law Claims (Count Eight and Count Nine)

Plaintiffs' Count Eight alleges misappropriation of the B&B Game and the B&B Mark and Count Nine alleges unjust enrichment. Compl. at ¶¶ 87-94. Defendants argue that Plaintiffs' claim

---

alleges that Plaintiffs have been using the mark before 2003. Plaintiffs also state in their opposition that they did have a "license agreement [with Defendants] which was later revoked." Plfs. Opp. at 28, n.8. The license agreement is also not referenced in the Complaint. Because Counts Six and Seven are dismissed without prejudice in order to allow Plaintiffs to correct their pleadings, Plaintiffs should address this apparent license agreement in their Amended Complaint because it is likely directly relevant to Plaintiffs' alleged continuous use of the B&B Mark.

for misappropriation fails because the patents are not valid and because the claim is preempted by federal patent law. Defendants further contend that Plaintiffs' unjust enrichment claim fails because Plaintiffs fail to allege that Defendants were enriched or that Plaintiffs had any reason to expect payment from Defendants. Opp. Br. at 33-36.

### i. Misappropriation (Count Eight)

Defendants argue that Plaintiffs' claim for misappropriation should fail because the patents are invalid and because it is preempted by federal law.[12] Defs. Br. at 34. In their Complaint, Plaintiffs fail to cite a statute or any other legal authority for their misappropriation claim. *See* Compl. at ¶¶ 87-90. In their opposition brief, Plaintiffs cite to one case that discusses misappropriation as an act that can constitute unfair competition under New Jersey's Unfair Competition statute, N.J.S.A. 56:4-1 *et seq.*[13] Plfs. Opp. at 32 (citing *Material Techs. v. Carpenter Tech. Corp.*, 2004 U.S. Dist. LEXIS 28892, at *54 (D.N.J. Dec. 14, 2004) ("Generally, [unfair competition under the statute] consists of the misappropriation of one's property by another— property which has some sort of commercial or pecuniary value. The misappropriation usually

---

[12] Defendants dedicate one sentence (and a string-citation to three cases) to arguing that federal preemption bars Plaintiffs' misappropriation claim. *See* Defs. Br. at 34 ("[Plaintiffs' misappropriation claim] also fails for the additional reason that it is pre-empted by federal patent law."). In reply, Defendants again mention this argument in passing, instead focusing on the position that Plaintiffs' state law claims are derivative of its patent claims. *See* Defs. Reply at 14-15. Federal preemption is a complex area of law not susceptible to passing arguments. Therefore, Defendants have not sustained their burden demonstrating that federal preemption applies.

[13] N.J.S.A. 56:4-1 states that "[n]o merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals." N.J.S.A. 56:4-2 provides a remedy for a violation of N.J.S.A. 56:4-1 and states that "[a]ny person, firm or corporation violating any of the provisions of section 56:4-1 of this title shall be liable, at the suit of the maker of such branded or trade-marked products, or any other injured person, to an injunction against such practices, and shall be liable in such suit for all damages, directly or indirectly caused, to the maker by such practices, which damages may be trebled in the discretion of the court."

takes the form of 'palming off' another's goods as your own, although the *modus operandi* is not essential." (internal quotations and citations omitted))). "Under New Jersey law, information that does not rise to the level of a trade secret may nevertheless be entitled to protection and may serve as the basis for a tort action." *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 F. App'x 754, 758 (3d Cir. 2009) (citing *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 299 (N.J. 2001)); *see Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 295, 666 A.2d 1028, 1038 (Law. Div. 1995) ("Under New Jersey law, to be judicially protected, misappropriated information need not rise to the level of the usual trade secret, and indeed, may otherwise be publicly available.").

Defendants similarly cite no authority to support their claim that a cause of action for misappropriation of a patent under New Jersey law would "presumably require, at a minimum, establishing federal patent infringement." Defs. Reply at 14; *see* Defs. Br. at 34. The Court denies Defendants' motion. While both parties fail to provide the Court with pertinent information, Defendants have not sufficiently demonstrated how Plaintiffs fail to state a cause of action for misappropriation under the New Jersey Unfair Competition statute. Therefore, Defendants' motion to dismiss Count Eight is denied.

### ii. Unjust Enrichment (Count Nine)

Defendants argue that Plaintiffs do not state a valid claim for unjust enrichment because Plaintiffs fail to allege that Defendants were enriched. Defendants add that Plaintiffs did not have a valid basis to expect payment from Defendants. Defs. Br. at 34-36. "To prove a claim for unjust enrichment, a party must demonstrate that the opposing party received a benefit and that retention of that benefit without payment would be unjust." *Thieme v. Aucoin-Thieme*, 227 N.J. 269, 288 (N.J. 2016) (internal quotation and citation omitted); *see Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 196 (D.N.J. 2012) ("For an unjust enrichment claim to succeed, there

must be a showing that the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred." (internal quotation and citation omitted)). The "quasi-contact doctrine also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* (internal quotation and citation omitted). "Since a plaintiff must confer a benefit on the defendant to support an unjust enrichment claim, this element has been interpreted by New Jersey courts as a requirement that "the plaintiff allege *a sufficiently direct relationship* with the defendant to support the claim." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 724 (D.N.J. 2011) (emphasis added) (quoting *Nelson v. Xacta 3000 Inc.*, 2009 WL 4119176, at *3 (D.N.J. Nov. 24, 2009)).

Here, the Court finds that Plaintiffs fail to plausibly allege a sufficient "direct relationship" with Defendants. *See, e.g., Cooper v. Samsung Elecs. Am., Inc.*, 2008 WL 4513924, at *10 (D.N.J. Sept. 30, 2008), aff'd, 374 F. App'x 250 (3d Cir. 2010) (dismissing unjust enrichment claim because a consumer's purchase was through a retailer, and therefore there was no relationship conferring any direct benefit on the manufacturer); *Union Tr. Co. of Maryland v. Wakefern Food Corp.*, 1989 WL 120756, at *21 (D.N.J. Sept. 8, 1989) ("unjust enrichment requires a relationship or course of dealings between parties which, if left undisturbed by the intervention of the law, permits one party to obtain 'unjust enrichment or unconscionable advantage' over the other." (citation omitted)); *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109–10 (App. Div. 1966) (finding that unjust enrichment requires "either some direct relationship between the parties or a mistake on the part of the person conferring the benefit"). Because such relationship

is a requirement of unjust enrichment under New Jersey law, Count Nine is dismissed without prejudice.

## V. CONCLUSION

Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Counts One, Two, Three, Four, and Five are dismissed with prejudice. Counts Six, Seven, and Nine are dismissed without prejudice to allow Plaintiffs an opportunity to file an amended complaint. Count Eight remains. Plaintiffs have thirty (30) days to file an amended complaint, if they so choose, consistent with this Opinion. If Plaintiffs fail to file an amended complaint, the dismissal of Counts Six, Seven, and Nine will also be with prejudice. An appropriate Order accompanies this opinion.

Dated: January 17, 2018

John Michael Vazquez, U.S.D.J.